25-291
*Richardson v. Townsquare Media, Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

August Term, 2025

(Argued: December 10, 2025     Decided: April 23, 2026)

Docket No. 25-291-cv

———————

DELRAY RICHARDSON,

*Plaintiff-Appellant,*

— v. —

TOWNSQUARE MEDIA, INC.,

*Defendant-Appellee.*

———————

B e f o r e:

LYNCH, NARDINI, and MENASHI, *Circuit Judges.*

———————

Plaintiff Delray Richardson appeals a judgment dismissing his copyright infringement claims on the pleadings. Richardson sued Townsquare Media, Inc. ("Townsquare") after it reproduced videos he created on a hip-hop news website it operates. First, Townsquare reproduced a video Richardson had recorded of

basketball legend Michael Jordan breaking up a fight (the "Jordan Video") in an article that speculated about the identity of an individual who may have been involved in the incident. Second, Townsquare, in two separate articles, embedded from YouTube an interview Richardson had conducted with the rapper Melle Mel in which Melle Mel criticized rapper Eminem (the "Melle Mel Video"). And in each of those three articles, Townsquare included a screenshot from the relevant video in the article's headline.

The district court (Alvin K. Hellerstein, *J.*) granted Townsquare judgment on the pleadings. We disagree in part and agree in part. First, the district court incorrectly determined, at the pleading stage, that Townsquare's use of the Jordan Video was fair. Because Townsquare republished the entire Jordan Video, it potentially provided consumers with a substitute work that obviated the need to seek out (and pay for) the video from Richardson. Second, the district court erroneously applied the *de minimis* doctrine to Townsquare's use of the screenshots from the Jordan and Melle Mel Videos. The doctrine does not apply in cases like this where the secondary use is clearly copied from the original work and is wholly recognizable. But, third, the district court correctly determined that Richardson's claim as to the Melle Mel Video was foreclosed by the license granted by YouTube's Terms of Service. That license unambiguously covers Townsquare's use.

Accordingly, we **VACATE** the district court's judgment as to Townsquare's use of the Jordan Video and the screenshots from both videos, **AFFIRM** the district court's judgment as to Townsquare's use of the Melle Mel Video, and **REMAND** for further proceedings consistent with this opinion.

––––––––––––––––––

CRAIG B. SANDERS, Sanders Law Group, Uniondale, NY, *for Plaintiff-Appellant.*

ABIGAIL B. EVERDELL, Davis Wright Tremaine LLP, New York, NY (Celyra I. Myers, Davis Wright Tremaine LLP, Washington, DC, and Rachel F. Strom, Davis Wright Tremaine LLP, New York, NY, *on the brief*), *for Defendant-Appellee.*

––––––––––––––––––

2

GERARD E. LYNCH, *Circuit Judge*:

Over a decade ago, videographer Delray Richardson recorded a seemingly chance encounter: basketball legend Michael Jordan breaking up a fight. That video (the "Jordan Video") received renewed interest in 2023 when a social media account republished it in a post claiming that the altercation involved a prominent social media personality. Townsquare Media, Inc. ("Townsquare") republished that post, which also contained the video, in a short article on its hip-hop news website.

That was not the only material created by Richardson that Townsquare reproduced. Richardson had also recorded an interview with rapper Melle Mel in which Melle Mel criticized rapper Eminem (the "Melle Mel Video"). After that video was posted on YouTube, Townsquare embedded it in two news stories: the first on Melle Mel's comments themselves and the second on rapper 50 Cent's response defending Eminem. In each of the three articles Townsquare published — the Jordan article and the two Melle Mel articles — it included a screenshot from the relevant video in the article's headline.

Richardson sued, claiming that Townsquare's use of his content violated his copyrights. The district court (Alvin K. Hellerstein, *J.*) disagreed, granting

3

Townsquare judgment on the pleadings. It concluded that Townsquare's use of the Jordan Video was fair, that its reproduction of the screenshots was *de minimis* and therefore not actionable, and that its embedding of the Melle Mel Video was permissible under the license provided by YouTube's Terms of Service. We disagree in part and agree in part.

First, the district court incorrectly determined, at the pleading stage, that Townsquare's use of the Jordan Video was fair. Because Townsquare republished the entire video, it potentially provided consumers with a substitute work that obviated the need to seek out (and pay for) the video from Richardson, precluding a finding of fair use on the pleadings alone.

Second, the district court erroneously applied the *de minimis* doctrine to Townsquare's use of the screenshots from the Jordan and Melle Mel Videos. The *de minimis* doctrine is typically implicated where a work's copying is not readily identifiable in a secondary work, and, as a result, the two works lack substantial similarity. The doctrine does not apply in a case like this, where the original work is wholly recognizable in the secondary work.

But, third, the district court correctly found Richardson's claim as to the Melle Mel Video foreclosed by the licensing grant in YouTube's Terms of Service.

That license unambiguously covers Townsquare's use.

## BACKGROUND

Plaintiff-Appellant Richardson is a professional videographer.[1] Defendant-Appellee Townsquare operates XXL, an online hip-hop news publication. On three occasions relevant to this appeal, XXL included Richardson's content in its articles.

*The Jordan Video.* In May 2015, Richardson recorded and published the Jordan Video. The Jordan Video is only forty-two seconds long, and its footage is grainy. But it captures an unexpected event: famous athlete Michael Jordan breaking up a fight between two individuals — according to Richardson, a "gang member" and one of Jordan's bodyguards, App'x 7 ¶ 2 — and then walking away to his car.

While the Jordan Video appears to have attracted little attention in the eight years after it was first published, it received a new life in July 2023 when the DailyLoud, a hip-hop blog, shared the full video on the social media platform

---

[1] As Richardson appeals the district court's judgment on the pleadings under Federal Rule of Civil Procedure 12(c), this background section is based on the allegations in Richardson's complaint and the documents attached thereto or that, though not attached or incorporated by reference, are "integral" to the complaint. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

X. The DailyLoud's accompanying post claimed that the video actually showed Jordan breaking up a fight between rapper Wack 100 (the "gang member" in Richardson's telling) and YouTube personality Charleston White, who according to the DailyLoud was standing outside the camera frame. Following the DailyLoud's post, White responded on social media, denying that he was a part of the fight, or even present at the scene.

Townsquare apparently found the exchange newsworthy and published an article on XXL addressing the Jordan Video, headlined "Michael Jordan Intervenes in Heated Confrontation Involving Wack 100 in Viral Video from 2015 — Watch." That article embedded the DailyLoud's X post, including its republication of the entire Jordan Video.[2] The article also used a screenshot (*i.e.*, a

---

[2] "Embedding is a method that allows a third-party website . . . to incorporate content directly from the website where it originally appeared." *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1062 (9th Cir. 2023). News websites often republish social media posts by way of embedding. When a website embeds a social media post, the website "appears to the user to have included the [post] in its content," when, "[i]n reality, the embedding website has directed the reader's browser to retrieve the public [social media] account and juxtapose it on the embedding website." *Id.* at 1064. As part of this process, "the embedding website does not store a copy of the underlying" content, but instead pulls the content from the social media platform's server. *Id.* at 1064–65.

Courts have reached different conclusions as to whether publication via embedding constitutes the making of a copy under the Copyright Act and thus whether it can give rise to a claim for infringement (an issue our Court has not

still image) from the Jordan Video as the background for its headline. That screenshot shows Jordan towering over the person claimed to be Wack 100 to his right and using his right arm to restrain that person from moving toward Jordan's left; it could plausibly be inferred that Jordan was keeping that person away from someone standing to Jordan's left outside the frame of the image.

*The Melle Mel Video*. Several years later, Richardson, along with an entity known as The Art of Dialogue, recorded an interview with rapper Grandmaster Melle Mel. On March 2, 2023, The Art of Dialogue posted on YouTube a three-minute excerpt from the interview entitled "Eminem Being White Is The Reason He's A Top 5 Rapper Of All Time. If He Were Black, He'd Be Average!" (the "Melle Mel Video").[3] The next day, Townsquare published an article on XXL

_____

yet addressed). *Compare Hunley*, 73 F.4th at 1062 (holding that embedding does not constitute copying), *with Lynk Media, LLC v. Independent Digital News & Media, LLC*, No. 24-cv-583, 2025 WL 2771625, at *9 n.6 (S.D.N.Y. Sept. 29, 2025) (identifying decisions from district courts in our Circuit that have held embedding to constitute copying). But Townsquare does not "take[] a position on this issue, and instead assume[s] *arguendo* that its embedding d[oes] constitute actionable use." Appellee's Br. 15. We therefore have no occasion to resolve the issue and similarly assume, for the purposes of this appeal, that embedding constitutes actionable use.

[3] Richardson does not specifically allege that he published the Melle Mel Video on YouTube; instead, he generically alleges that the Melle Mel Video was "published." App'x 9 ¶ 18. However, the XXL articles that he attaches to his

covering the release of the Melle Mel Video. As part of its reporting, Townsquare embedded the video from The Art of Dialogue's YouTube channel. The background for the article's heading was a screenshot from the video of Melle Mel sitting juxtaposed with a photograph of Eminem.

Two days later, Townsquare published a follow-up story on rapper 50 Cent's defense of Eminem following Melle Mel's comments. That second article also embedded the Melle Mel Video from YouTube and, as the background for its headline, included a different screenshot of Melle Mel from the video, this time placed next to a photograph of 50 Cent.

Richardson sued Townsquare for copyright infringement based on its publication of the Jordan Video, the Melle Mel Video, and screenshots from both videos. Townsquare raised several defenses in its answer and subsequent motion for judgment on the pleadings, including that its use of the Jordan Video was fair; that it published the Melle Mel Video pursuant to a valid license contained in the YouTube Terms of Service; and that its use of the screenshots was *de minimis* and therefore not actionable. The district court granted Townsquare's motion in full,

complaint and that he claims infringed upon the Melle Mel Video refer to the video as having been published on The Art of Dialogue's YouTube channel. Richardson nowhere disputes the accuracy of that statement.

8

and Richardson appealed.

## DISCUSSION

### I. Standard of Review

"We review *de novo* a district court's decision to grant a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c)." *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 78 (2d Cir. 2015). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (internal quotation marks omitted and alteration incorporated). We therefore "draw all reasonable inferences in the plaintiff's favor" and must vacate the district court's judgment "if there are issues of fact which if proved would [permit a verdict for the non-moving party], even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial." *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 301 (2d Cir. 2021)  (internal quotation marks omitted).

### II. The Jordan Video

The district court granted judgment on the pleadings for Townsquare on the use of the Jordan Video, as the court concluded that the use was fair. Under

the Copyright Act, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, [or] news reporting . . . is not an infringement of copyright." 17 U.S.C. § 107. Fair use "thus excuses what might otherwise be considered infringing behavior, allowing courts to avoid rigid application of the Copyright Act when it would stifle the very creativity the Act is meant to promote." *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163, 179 (2d Cir. 2024) (internal quotation marks omitted). To assess fair use, we consider four non-exclusive statutory factors: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. While courts typically discuss each factor individually, they must "[a]ll . . . be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994).

Because the determination of fair use "is an open-ended and context-sensitive inquiry," *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013), "[c]ourts most frequently address a proffered fair use defense at summary

judgment," *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016). That rule is not absolute, and we have "acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim." *Id.* Nevertheless, when evaluating the fair-use defense at the pleading stage, we must be mindful that in order to warrant dismissal of a complaint, the fair-use factors must point decisively in the defense's favor. That analysis must be based on the facts pled in the plaintiff's complaint, fully crediting the accuracy of those facts and drawing every reasonable inference from those facts in the plaintiff's favor. For the complaint to survive dismissal, we need not conclude that the fair-use factors require a *rejection* of the fair-use defense; it is sufficient that the plaintiff's infringement claim remains "plausible" after those factors are weighed based on the limited materials we can consider at the pleading stage. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Here, we disagree with the district court's dismissal on the pleadings, based on fair use, of Richardson's claim concerning the Jordan Video. As explained below, the district court erred in assessing the first, third, and fourth statutory fair-use factors. A correct evaluation of those factors demonstrates that the defense is not warranted at the pleading stage in this case.

11

**A. The Purpose and Character of Use**

The first factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Accordingly, in assessing this factor, "courts consider two sub-factors: (i) the extent to which the secondary use is transformative and (ii) whether the secondary use is commercial in nature." *Hachette*, 115 F.4th at 179. We consider each sub-factor below.

*1. Transformativeness*

A secondary use is "transformative" where it does not "merely supplant[] the original," but "'instead adds something new, with a further purpose or different character, altering the original with new expression, meaning, or message.'" *Id.* (alteration incorporated), quoting *Campbell*, 510 U.S. at 579. We typically frame the inquiry in terms of "substitution": A secondary use will not be transformative where it merely offers a substitute for the original work. Instead, a use may be transformative where it was made for and objectively realizes a purpose distinct from that of the original work. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528, 545 (2023). In addition, that new purpose must supply a sufficient "justification for copying," such as

12

providing a "critique or commentary on the original" or supplying "information to the public about the copied work" that is not otherwise available. *Romanova v. Amilus Inc.*, 138 F.4th 104, 115 (2d Cir. 2025). As "[m]ost copying has some further purpose" and "[m]any secondary works add something new," the inquiry will not always be "clear cut." *Warhol*, 598 U.S. at 528–29. We therefore assess transformativeness as a "matter of degree" and weigh it "against other considerations, like commercialism." *Id.* at 525.

The district court determined that the first factor supported fair use because Townsquare's use of the Jordan Video was transformative. Because Townsquare republished the video as part of "a news report[] where 'the [video was] itself the subject of the story,'" the district court ruled, the "purpose and character" of its use was different from that of Richardson's initial publication. App'x 126, quoting *Barcroft Media, Ltd. v. Coed Media Group, LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017). The court observed that Townsquare's article "added new information and context" to the video, namely the "speculation" about Charleston White's involvement in the incident and White's denial "in response." *Id*. at 126–27.

A review of Townsquare's article, however, indicates that the question of

13

transformativeness is a closer call than the district court's analysis suggests. While, at a general level, Townsquare republished the Jordan Video in a news article describing a controversy surrounding the video, Townsquare's reporting at times appears more focused on the mere existence and presentation of the video itself. No place is that more evident than in the article's headline. Instead of referring to any of the article's commentary, the headline presents *the video* as the article's primary draw: "Michael Jordan Intervenes in Heated Confrontation Involving Wack 100 in Viral Video from 2015 —Watch." *Id*. at 52. The article then opens by explaining that the DailyLoud had posted the video on X just one day prior. That is the extent of the article's discussion of the video's online circulation. It moves on to describe the incident depicted in the video, but that portion of the article simply describes what viewers of the video can see for themselves. Only at the end does the article discuss the possible presence of Charleston White off-screen and his denial of any involvement in the fight.

By offering some modicum of commentary about the video, the article's copying arguably "communicate[d] a message that differ[ed] from the message of the" video itself, which was to document the fight. *Romanova*, 138 F.4th at 118–19. At the same time, there is a difference between gesturing towards a

transformative message and actually communicating that message. Here, Townsquare's commentary was limited to a few sentences explaining that a third party had republished the video and opined that an individual who does not appear in it was Charleston White. Notably, the article does not identify anything *in the video* that would corroborate that speculation for the viewer; instead it relies on the unexplained say-so of the DailyLoud's post. It is therefore debatable whether the article meaningfully communicated any new commentary about the *video* (which could justify its copying) or instead merely summarized commentary about the fight depicted and relied on the video solely as an illustrative aid (in which case the copying served little transformative function). "A use is transformative if it does something more than repackage or republish the original copyrighted work." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). But in this case, the video was reproduced without modification and with minimal integration into the accompanying news article, which suggests that the video may have retained its original purpose and character in the new packaging of Townsquare's website.

Ultimately, however, we need not reach any definitive conclusion as to the precise degree of the article's transformativeness, because even if it were

sufficiently transformative to weigh in favor of fair use, other factors described below militating against fair use would strongly outweigh whatever transformative value could be attributed to Townsquare's use of the Jordan Video.

### 2. Commercial Nature

Under the first fair-use factor, we also consider the secondary use's "commercial nature." *Warhol*, 598 U.S. at 532. The district court erred by failing to address this sub-factor. It is undisputed that Townsquare is a for-profit entity, a fact that weighs against fair use. At the same time, "we have recognized that almost all newspapers, books and magazines are published by commercial enterprises that seek a profit and have discounted this consideration where the link between the defendant's commercial gain and its copying is attenuated such that it would be misleading to characterize the use as a commercial exploitation." *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (internal quotation marks and citations omitted and alterations incorporated). Townsquare ran advertising alongside its embedded depiction of the Jordan Video, but classic legacy news media such as newspapers, news magazines, and commercial television stations did, and do, the same. On a full

16

factual record, it might prove to be "misleading to characterize [Townsquare's] use [of the Jordan Video] as commercial exploitation." *Id.* (internal quotation marks omitted). Nonetheless, at the pleading stage, this sub-factor cannot count in favor of Townsquare's fair-use defense.

***

Our assessment of the first factor is, at best, neutral in the fair-use analysis. Even if Townsquare's limited showing of transformativeness weighs in favor of fair use, that weight is offset by Townsquare's commercial status.

## B. Nature of the Copyrighted Work

The second statutory factor considers "the nature of the copyrighted work," 17 U.S.C. § 107(2), in recognition of the fact that "some works are closer to the core of intended copyright protection than others," *Campbell*, 510 U.S. at 586. We ask whether the copyrighted work is more "expressive" or "factual," as fair use is more likely to be found where the work is "factual or informational." *Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 45 (2d Cir. 2021) (internal quotation marks omitted). We also ask whether the copyrighted work has been previously published, because "the scope of fair use involving unpublished works" is far more limited. *Id.* (internal quotation marks omitted).

17

This factor plays a minimal role in the fair-use assessment. *Hachette*, 115 F.4th at 187.

Here, the district court concluded that this factor weighed in favor of fair use, because "[t]he original Jordan video was published online and depicted factual and newsworthy events." App'x 127. We agree. The Jordan Video was largely factual, and, as Richardson concedes, did not involve meaningful creative choices. That Richardson was fortunate to be in the right place at the right time to record Jordan's unexpected intervention does not make the work creative. Other courts have similarly found that this factor weighed in favor of fair use where the copyrighted work was "merely a candid shot in a public setting." *Katz v. Google Inc.*, 802 F.3d 1178, 1183 (11th Cir. 2015); *see also, e.g.*, *Los Angeles News Service v. CBS Broadcasting, Inc.*, 305 F.3d 924, 940 (9th Cir. 2002). Thus, this factor, though of limited import, weighs in favor of fair use.

## C. The Amount and Substantiality of Use

The third statutory factor asks "whether 'the quantity and value of the materials used are reasonable in relation to the purpose of the copying.'" *Warhol*, 11 F.4th at 46, quoting *Campbell*, 510 U.S. at 586. "Generally, a finding of fair use is more likely when 'small amounts, or less important passages of the work are

copied than when the copying is extensive, or encompasses the most important parts of the original.'" *Hachette*, 115 F.4th at 187 (alteration incorporated), quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015). But the inquiry remains context-specific, and a fair-use defense may be available even where a secondary work uses the entirety of the original. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006). Moreover, the factor is not susceptible to determination purely by an arithmetical calculation of the percentage of the work that is used. Where the work itself is large, copying a small percentage of the work could nonetheless, in some circumstances, constitute a substantial taking, while in the case of a work that is small in size or duration, a transformative purpose might be hard to serve by a mere excerpt.

Here, Townsquare concedes that it republished the entirety of the Jordan Video but contends that such use was "necessary," an assessment with which the district court agreed. Appellee's Br. 38, quoting App'x 128. Townsquare's arguments in support, however, are premature and underdeveloped at the pleading stage. It first argues that it could not reasonably publish only a portion of the video because it embedded the DailyLoud's X post which featured the entire video. But that argument takes as a foregone conclusion that Townsquare

19

had no reasonable alternative but to embed the post; there is no reason to think that was the case. Townsquare could have, for example, republished the text of the post along with a portion of the video. Or it could have taken a screenshot of the post with a still of the video (as Townsquare did for the article's headline).[4] Or it could have simply reported on the controversy and included a hyperlink to the post, forgoing any reproduction of the video. While embedding the post may have been more expedient for Townsquare, nothing compels a conclusion (and certainly not at this stage) that embedding the post and, with it, the entire video was *reasonable* in relation to Townsquare's limited news reporting.

Townsquare's related argument that republishing the entire Jordan Video was necessary to convey information to the public accurately is similarly unpersuasive. For one, Townsquare identifies in its briefing no information that it could communicate accurately only by republishing the video in full. At oral argument, Townsquare maintained that the full video allowed viewers to speculate as to whether Charleston White was *in fact* involved in the fight despite his denial. But that argument is entirely unpersuasive, as the second person

_____

[4] We do not suggest that had Townsquare followed either of these alternatives, the third factor would necessarily weigh in its favor. We include them only to illustrate the erroneous assumption underlying Townsquare's argument.

20

involved in the altercation (whoever that person might have been) never appears in the video, but rather remains off-camera throughout. Townsquare also contended at oral argument that embedding the entire post was necessary to capture the aspects of the video related to its publication on social media, including comments from other users who viewed the video and expressed opinions about whether White was involved in the incident. But again, there is no reason why that is so. Townsquare could have "conveyed the [v]ideo's virality," for example, "by providing a screenshot of the number of likes or views the [v]ideo received," *Nicklen v. Sinclair Broadcast Group, Inc.*, 551 F. Supp. 3d 188, 198 (S.D.N.Y. 2021), or by simply reporting those numbers. And it could have republished certain comments to characterize the tenor of public opinion. Perhaps discovery may offer further editorial or technological justification for Townsquare's decision to use the entirety of the video. But at present, the facts pled do not demonstrate, as a matter of law, that such use was reasonable in relationship to Townsquare's reporting purposes.

### D. Effect on Potential Market for the Copyrighted Work

The final statutory factor addresses "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Our cases have

21

repeatedly recognized this factor as the most important. *See, e.g., Hachette*, 115 F.4th at 189; *Authors Guild*, 804 F.3d at 214. We consider primarily whether the secondary work "*usurps* the market for the first [work] by offering a competing substitute." *Warhol*, 11 F.4th at 48 (emphasis in original). In doing so, we weigh "not only the market harm caused by the particular actions of the alleged infringer, but also the market harm that would result from unrestricted and widespread conduct of the same sort." *Hachette*, 115 F.4th at 189, quoting *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 179 (2d Cir. 2018). This factor subsumes much of the content of the other factors, whose force lies in evidencing the market effect of the use. For example, it relates to the third factor, because "the greater the amount and substantiality of the use, 'the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original.'" *Id.* at 187–88, quoting *Authors Guild*, 804 F.3d at 221. And, as relevant to the first factor, the more transformative a secondary use is, the less likely it is to serve as a mere substitute for the original. *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018).

The district court erred in concluding that the factor supported fair use at the pleading stage, as its reasoning was based on a factually unfounded and

22

legally impermissible inference in Townsquare's favor. According to the district court, it was implausible that Townsquare's article would compete with the market for the Jordan Video because the article had surrounded the video with reporting and "potential purchasers of the original work are unlikely to 'find reviewing the news article an adequate substitute.'" App'x 128, quoting *Nicklen*, 551 F. Supp. 3d at 198. We acknowledge that Richardson's complaint is not entirely clear about what the market for the Jordan Video *is*.[5] Nonetheless, it is plausible that viewers may not need to pay Richardson to watch the Jordan

---

[5] Townsquare attempts to burden Richardson with "articulat[ing] a legally cognizable theory of market harm." Appellee's Br. 45. But of course, we "have unequivocally placed the burden of proof on the proponent of" the fair-use defense. *Warhol*, 11 F.4th at 49 (internal quotation marks omitted). And while some of "our prior cases have suggested that the rightsholder bears some initial burden of identifying relevant markets," those cases did so at summary judgment. *Id.* at 49 & n.11, citing *Authors Guild*, 755 F.3d at 96 and *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 n.6 (2d Cir. 1998). At the pleading stage, a plaintiff need not identify the relevant markets in anticipation of a defendant's fair-use defense. That is a corollary of the general rule that "[t]he pleading requirements in the Federal Rules . . . do not compel a litigant to anticipate potential affirmative defenses . . . and to affirmatively plead facts in avoidance of such defenses." *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). At any rate, the issue is not whether the complaint was somehow deficient in failing to explicate the nature of the market for the Jordan Video. Rather, it is that Townsquare cannot decisively demonstrate the absence of an effect of its use of the Jordan Video on the market for the original video based on the allegations in a complaint that say little or nothing about the nature of that market.

Video a second time if they are able to see it in full on Townsquare's website or on another website that republished the DailyLoud's X post. It is entirely unclear that a viewer of Townsquare's story would gain anything from watching a version of the Jordan Video unencumbered by Townsquare's reporting, advertising, and the X post text and border. And if viewers are unlikely to gain anything, they would have little reason to seek out the Jordan Video from Richardson. And without viewers, Richardson would experience market harm either by lost advertising revenue (if, like Townsquare, he had published the video online) or lost rental or purchase revenue (if he provided the video directly

to consumers).[6] These are inferences we are required to make in *Richardson's*

favor.

The "burden" of demonstrating "that the secondary use does not compete

in the relevant market" is a significant hurdle for a defendant to clear prior to

discovery. *Warhol*, 11 F.4th at 49. It is therefore no surprise that we have typically

found this factor satisfied at the pleading stage only when it was clear that the

two works were not substitutes. In *Brown*, for example, we considered the

defendant's use in its documentary film of an eight-second excerpt of a three-

minute song. *Brown v. Netflix, Inc.*, 855 F. App'x 61, 63–64 (2d Cir. 2021)

---

[6] Richardson separately argues that if Townsquare's use of the Jordan Video were widespread, he would suffer harm from lost licensing revenue from Townsquare and other media companies that republished the DailyLoud's post. But "it is always a given that [a] plaintiff suffers a loss of some *potential* [licensing] market if that potential is defined as the theoretical market for licensing the very use at bar." 4 Nimmer on Copyright § 13F.08 (2026) (footnote omitted and emphasis in original). Accordingly, to avoid this "danger of circularity," *id.*, we have limited our consideration of lost licensing revenue under the fourth fair-use factor to include only "traditional, reasonable, or likely to be developed markets," *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929–30 (2d Cir. 1994). The question of lost licensing revenue is thus bound up in the issue of transformativeness; where a secondary use is transformative, the use is unlikely to fall into a "traditional" or "likely to be developed" licensing market. Because, as explained above, the issue of transformativeness is a close call here and it is otherwise clear that the fourth statutory factor weighs against fair use, we need not definitively decide whether Richardson's assertion of lost licensing revenue also may be factored into the fair-use assessment.

(summary order). Given how brief the excerpt was, we concluded that "the intended audience for the [original song] would be unlikely to purchase [the documentary film] in preference to the original." *Id.* at 64 (internal quotation marks omitted). Likewise, we decided in *Lombardo* that a parody of Dr. Seuss's *How the Grinch Stole Christmas* "mock[ing] the naïve, happy world of the Whos" did not offer a market substitute for the original book. *Lombardo v. Dr. Seuss Enterprises, L.P.*, 729 F. App'x 131, 132–33 (2d Cir. 2018) (summary order). Here, because Townsquare has not shown that its use of the Jordan Video is not a market substitute for the Jordan Video itself, the fourth statutory factor weighs against fair use.

***

In sum, a determination of fair use of the Jordan Video at the pleading stage cannot be justified. To whatever extent Townsquare's use of the Jordan Video is transformative (if at all), that fact is outweighed by Townsquare's decision to republish the entire video. That choice rendered its use of the video a plausible market substitute for the video itself. Discovery may further explicate the relevant market factors, and thus demonstrate that Townsquare's use of the full video was reasonably justified or that customers interested in watching the

video would still seek out the original to avoid the article's text and advertising. That, however, is not apparent at this early point in the litigation.

### III. The Jordan and Melle Mel Screenshots

The district court concluded that Townsquare was entitled to use screenshots from the Jordan and Melle Mel Videos under the *de minimis* doctrine. Once again, we disagree with the district court's conclusion. The *de minimis* doctrine has no application here, as Townsquare prominently displayed the screenshots as the backdrop to the headline in each article.

While the district court and the parties refer to the *de minimis* doctrine at various points as a defense, we have noted that the doctrine is not a special case of "fair use" or some other defense, but is more accurately treated as an example of a plaintiff's failure to present a *prima facie* case of infringement. *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75–76 (2d Cir. 1997). "To establish infringement, the copyright owner must demonstrate that (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 110 (2d Cir. 2001) (internal quotation marks omitted and emphasis in original). Here, the first

element is clearly alleged. By taking screenshots, Townsquare made literal copies of video "frames" and incorporated those copies into its articles.

As for the second element, substantial similarity has both a qualitative and a quantitative component. "The qualitative component concerns the copying of expression, rather than ideas," while "[t]he quantitative component generally concerns the amount of the copyrighted work that is copied." *Ringgold*, 126 F.3d at 75. While the term "*de minimis*" might ostensibly suggest a quantitative focus, and thus imply, as the district court appears to have believed, that copying a single frame capturing a split-second image from a longer video would inherently qualify for such a doctrine, the doctrine in reality is more complex. In evaluating whether use is *de minimis,* we have instructed courts to look at "the amount of the copyrighted work that was copied, as well as[] (in cases involving visual works)[] the observability of the copyrighted work in the allegedly infringing work." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998). "Observability, in turn, includes review of the 'focus' and 'prominence' of copyrighted material in the allegedly infringing work." *Eliahu v. Mediaite, LLC*, No. 23-cv-11015, 2024 WL 4266323, at *3 (S.D.N.Y. Sept. 23, 2024), quoting *Ringgold*, 126 F.3d at 75.

Applying that standard, we have typically found *de minimis* use where the defendant's inclusion of the copyrighted work was incidental or unidentifiable in the secondary work. In *Sandoval*, for example, we considered the use of the plaintiff's photographs in David Fincher's crime thriller *Seven*. The photographs appear in one scene as "transparencies affixed to [a] light box" in an apartment belonging to the murder suspect. 147 F.3d at 216. The photographs "never appear in focus," and are primarily "seen in the distant background." *Id.* In the two shots in which the photographs are in the foreground, the "figures in [them] are barely discernable." *Id.* Based on those facts, we concluded that Fincher's use was *de minimis*, because the photographs were "not displayed with sufficient detail for the average lay observer to identify even the subject matter of the photographs, much less the style used in creating them." *Id.* at 218; *see also, e.g., Gottlieb Development LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 632–33 (S.D.N.Y. 2008) (finding *de minimis* use of plaintiff's pinball machine in film where it was "always in the background" and was "never mentioned and play[ed] no role in the plot"); *Gayle v. Home Box Office, Inc.*, No. 17-cv-5867, 2018 WL 2059657, at *2–*3 (S.D.N.Y. May 1, 2018) (finding HBO's use of plaintiff's graffiti in background of scene was *de minimis* where it was barely visible, never

29

in focus, had "no role in the plot," and appeared "on screen for no more than two to three seconds" (internal quotation marks omitted)).

Consider, in contrast, our decision in *Ringgold*, which rejected a *de minimis* argument. There, BET and HBO included in a television show a poster featuring a painting by artist Faith Ringgold. 126 F.3d at 72. The poster was displayed "as a wall-hanging in [a] church hall" during a music recital, where it appeared in nine sequences totaling 26.75 seconds. *Id.* at 72–73. In one "four-to-five-second segment[,] . . . almost all of the poster [was] clearly visible." *Id.* at 77. Although at no point did "the dialogue, action, or camera work" call particular attention to the poster, we concluded that the use of the poster was not *de minimis*, as "[t]he painting component of the poster [was] recognizable as a painting, and with sufficient observable detail for the 'average lay observer' to discern [the depiction of] African-Americans in Ringgold's colorful, virtually two-dimensional style." *Id.* at 73, 77, quoting *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992); *see also, e.g.*, *Hirsch v. CBS Broadcasting Inc.*, No. 17-cv-1860, 2017 WL 3393845, at *4–*5 (S.D.N.Y. Aug. 4, 2017) (use of plaintiff's photograph of Ivanka Trump's stalker in television program about stalkers was actionable even though it appeared on

30

screen only for two seconds, as "[t]he observability factors . . . all disfavor[ed] a finding of *de minimis* infringement").

Here, the district court concluded that Townsquare's publication of the screenshots from the Jordan and Melle Mel Videos as background images for its articles' headlines constituted *de minimis* use because a "[s]ingle-still frame . . . make[s] up a very small fraction of the original video." App'x 130. That reasoning overlooks the *de minimis* doctrine's emphasis on observability. As the cases above illustrate, the doctrine applies where the copyrighted work plays a negligible or incidental role in the secondary work. But here, the copyrighted work is the very subject of the secondary work. Townsquare included the screenshots to signal to readers the topics of its articles. Thus, not only would a reader be able to readily identify the "subject matter" of the screenshots, easy identification was indeed Townsquare's intention in reproducing them. *Sandoval*, 147 F.3d at 218.

Moreover, as Richardson argues, the district court's reasoning is hard to square with 17 U.S.C. § 106(5), which grants exclusive copyrights to "the individual images of a motion picture or other audiovisual work." Thus, one could understand the copyrighted work here to be the individual screenshots

31

and not just the videos they are part of. Viewed through that lens, Townsquare reproduced in each article not "a very small fraction" of a copyrighted work but the entire work. App'x 130. The reproduction of a single frame of a larger video may constitute in certain circumstances *de minimis* use, but it cannot be the sole basis for that finding.

Lastly, Townsquare argues that the observability analysis employed in cases like *Ringgold* and *Sandoval* has no place here, because those cases involved "visual works" and not "video works." Appellee's Br. 47–49. That argument is meritless. While *Ringgold* specifically addressed its observability analysis to the copying of a "visual work," 126 F.3d at 74, there is no "principled reason why *Ringgold* can be disregarded" wholesale based on the medium of the copyrighted and secondary works, *Eliahu*, 2024 WL 4266323, at *4. A video such as the ones at issue in this case is, after all, an audio*visual* work, and the analysis in *Ringgold* would seem fully applicable if the work seen in the background of the accused film were a TV screen showing, even for just a few seconds, a clearly recognizable clip from a famous film (say, the farewell scene in *Casablanca*),

32

rather than a poster.[7] Whether a secondary use of a copyrighted work is *de minimis* depends on whether the secondary use would be recognizable to an "average lay observer," an inquiry that necessarily turns not just on how much of the copyrighted work a potential infringer uses but also on how the work is presented. *Ringgold*, 126 F.3d at 77. To be sure, the observability factors may vary across media. For example *Ringgold*'s references to "lighting" and "camera angles" are irrelevant in discussing Townsquare's reproduction of still images on its website. But the fact that particular observability factors may be medium-specific does not alter the nature of the general inquiry.

Accordingly, the district court erred in finding Townsquare's use of the screenshots to be, as a matter of law at the pleading stage, *de minimis*. Townsquare prominently displayed the screenshots, which are clearly recognizable as taken from the embedded videos (as Townsquare *intended* them to be), to communicate the subject matter of its articles. As a fallback, Townsquare argues that the qualitative component of substantial similarity is not

---

[7] Moreover, it appears that *Ringgold* plainly considered "audiovisual" works as a type of "visual" work. The decision explained how previous "caselaw provide[d] little illumination concerning claims that copyright in a visual work" — like Ringgold's work — "ha[d] been infringed by including it within another visual work" — like the BET/HBO *television show*. 126 F.3d at 74.

satisfied, because its use of the screenshots "capture[d] none of the most important qualitative components of the Videos." Appellee's Br. 50. But that too is not determinable at this stage of the case; the screenshots arguably capture some important qualitative components from the videos, even if those components are of a factual nature. The screenshot from the Jordan Video documents the basketball star in action, towering over one of the fight's participants. And the screenshots from the Melle Mel Videos, while they do not communicate Melle Mel's statements regarding Eminem, arguably evince the confident, matter-of-fact demeanor with which he spoke.

Finally, Townsquare invites us to affirm on the alternative ground that its use was fair. It is, of course, significant that the quantitative portion of the third statutory factor, which loomed large in the fair-use discussion above regarding Townsquare's copying of the entire Jordan Video, would cut the other way with respect to the screenshots. Nevertheless, the district court did not rule on that basis, and an "appellate court [typically] does not consider an issue not passed upon below." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012) (internal quotation marks omitted). Moreover, for the same reasons discussed above, the fair-use analysis is generally ill-suited to the pleading stage.

34

We therefore decline to address that issue here. Accordingly, we vacate the district court's judgment as to Richardson's claim regarding the screenshots and remand for further proceedings.

**IV. Melle Mel Video**

Finally, the district court concluded that Townsquare had a valid licensing defense for embedding the Melle Mel Video based on YouTube's Terms of Service ("Terms"). We agree and affirm the judgment for Townsquare as to this claim.

"A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). "The existence of a license is an affirmative defense, placing upon the party claiming a license the burden of coming forward with evidence of one." *Spinelli v. National Football League*, 903 F.3d 185, 197 (2d Cir. 2018) (internal quotation marks omitted). "[W]hen the existence of a license is not in question, a copyright holder must plausibly allege that the defendant exceeded particular terms of the license." *Yamashita v. Scholastic Inc.*, 936 F.3d 98, 105 (2d Cir. 2019).

The district court took judicial notice of YouTube's January 5, 2022 Terms of Service, of which Townsquare attached a copy to its motion for judgment on the pleadings. The Terms are one of several agreements that govern a YouTube user's enjoyment of the platform. The Terms provide, among many other things, that a user who uploads a video to YouTube grants YouTube a license to his content, which includes the ability to sublicense that content:

> *License to YouTube*
>
> By providing Content to the Service [i.e., YouTube], you grant to YouTube a worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use that Content (including to reproduce, distribute, prepare derivative works, display and perform it) in connection with the Service and YouTube's (and its successors' and Affiliates') business, including for the purpose of promoting and redistributing part or all of the Service.

App'x 114. In another portion of the Terms, YouTube grants users the ability to "show YouTube videos through the embeddable YouTube player." *Id*. at 111.

In addition, the Terms provide that a user grants a separate license to other YouTube users that allows them to embed the user's content through YouTube:

> *License to Other Users*
>
> You also grant each other user of the Service a worldwide, non-exclusive, royalty-free license to access your Content through the Service, and to use that Content, including to reproduce, distribute, prepare derivative works, display, and perform it, only as enabled by a feature of the Service (*such as video playback or embeds*). For clarity, this license does not grant any rights

36

or permissions for a user to make use of your Content independent of the Service.

*Id.* at 115 (emphasis added).

Accordingly, under the Terms, when The Art of Dialogue uploaded the Melle Mel Video to YouTube, The Art of Dialogue gave permission to YouTube to sublicense the video to Townsquare and provided a license directly to Townsquare as well. Both the license and sublicense included the ability to republish the video from YouTube by means of embedding.

While we normally would not consider extrinsic evidence attached to a defendant's motion under Rule 12(c), "[w]e have recognized . . . that in some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Goel*, 820 F.3d at 559. "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not

37

attached to the complaint." *Id.*, quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

That exception applies here, where Richardson does not meaningfully dispute the applicability of the Terms to Townsquare's uses of the Melle Mel Video. To be sure, he argues in his reply brief that the district court improperly considered the Terms in the context of a motion for judgment on the pleadings, as the district court made multiple implicit factual determinations, including that the Melle Mel Video had been on YouTube, that it had been uploaded by Richardson or a *bona fide* licensee, and that Townsquare attached a true copy of the Terms. But Richardson does not anywhere argue that those implicit factual determinations were wrong. He does not, for example, assert that the Melle Mel Video was uploaded onto YouTube without his consent or that the version of the Terms that Townsquare attached was in any way inaccurate. Had he done so, the resulting factual dispute would have rendered the Terms premature for consideration at the pleading stage. But his failure to do so confirms that he sought to rely on "clever drafting" to render his complaint "invulnerable to Rule 12[c]." *Global Network Communications*, 458 F.3d at 157. Accordingly, we are free

(and the district court was correct) to consider the YouTube Terms in assessing the motion for judgment on the pleadings.[8]

Nor are any of Richardson's other arguments persuasive. First, he contends that even if the district court could consider the Terms at the pleading stage, the resolution of the licensing defense is premature because the meaning of the license itself is ambiguous. But the language of the Terms quoted above is clear: The Art of Dialogue "grant[ed] each other user," including Townsquare, a "license to access" its videos, including the Melle Mel Video, and to "use th[ose]" videos for, among other purposes, "embeds." App'x 115.

Faced with such clear language, Richardson directs our attention elsewhere, to Section 12 of YouTube's API Terms, a separate agreement that a user must abide by to use YouTube's embedding feature in the manner that Townsquare did. That section reads: "You and your API Client(s) will not, and you will require those acting on your behalf and your users to not, infringe or violate third-party rights, including intellectual property rights." Appellant's Br.

---

[8] Moreover, because Richardson failed to argue that the district court erred in considering the Terms in his opening appellate brief and did so only in his reply, that argument is forfeited. *See In re Sears Holdings Corp.*, 51 F.4th 53, 65 (2d Cir. 2022).

54 n.6. According to Richardson, that section "contradict[s] . . . the existence of a sub-license as it implies that [Townsquare] would require permission directly from the copyright holder in order to embed content outside of YouTube's platform." *Id.*

Richardson's reading of the clause, however, is incorrect, because it would render the Terms' license grant superfluous; if a user were required to obtain permission directly from a creator to embed his content from YouTube, then the license's specific reference to embedding serves no purpose. Under California law, which governs the Terms, "contracts . . . are to be construed to avoid rendering terms surplusage." *Farmers Insurance Exchange v. Knopp*, 50 Cal. App. 4th 1415, 1421 (1996). And, in any event, the two provisions are readily harmonized. Section 12 prohibits users only from violating other users' intellectual property rights, but there is no violation where a user reproduces content as permitted by the Terms' license. Because Townsquare republished the Melle Mel Video through YouTube's embedding feature as the Terms authorized, Section 12 is inapplicable here.

Second, Richardson argues that, even if the license provided by the Terms were unambiguous, questions of fact remain as to whether Townsquare

"complied with the terms and conditions imposed by YouTube with respect to embedded videos." Appellant's Br. 50. While he identifies various requirements in YouTube's policies that he claims Townsquare *may* not have followed,[9] he fails to identify any that are conditions precedent to the Terms' licensing provisions, such that Townsquare's putative failure to comply with those policies would exceed or nullify its license to embed the Melle Mel Video.

In evaluating claims for copyright infringement where there exists an underlying licensing agreement, "[w]e refer to contractual terms that limit a license's scope as 'conditions,' the breach of which constitute[s] copyright infringement. We refer to all other license terms as 'covenants,' the breach of which is actionable only under [state] contract law." *MDY Industries, LLC v.*

---

[9] For example, in his opening brief, Richardson observes that certain terms mandate that Townsqure "display[] a link to YouTube's Terms of Service on [its] third-party websites, instruct[] users of [its] third-party websites that they are agreeing to be bound by the YouTube Terms of Service, and requir[e] users of [its] third-party websites to agree to a privacy policy." Appellant's Br. 54–55. And in his reply, Richardson points to a section of the Terms of Service entitled "Your Use of the Service" that is separate from the Terms' licensing provisions. The "Your Use of the Service" section includes rules prohibiting users from "us[ing] [YouTube's] [s]ervice to view or listen to [c]ontent other than for personal, non-commercial use" and from "sell[ing] advertising, sponsorships, or promotions on any page of any website . . . where [c]ontent from [its] [s]ervice is the primary basis for such sales." Appellant's Reply Br. 25, quoting App'x 113.

*Blizzard Entertainment, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010) (internal citation omitted). Under California contract law, "[c]onditions precedent are disfavored . . . and courts will not construe contract terms to create conditions precedent unless the language of the contract clearly requires such a construction." *Sullivan v. Finn*, No. 16-cv-01948, 2017 WL 1209933, at \*5 (N.D. Cal. Apr. 3, 2017), citing *Helzel v. Superior Court*, 123 Cal. App. 3d 652, 663 (1981) ("As a general rule of contract construction conditions precedent are not favored.") and *Antonelle v. Kennedy & Shaw Lumber Co.*, 140 Cal. 309, 319 (1903) ("Courts are disinclined . . . to construe the stipulations of a contract as conditions precedent, unless compelled by the language of the contract plainly expressed.").

Here, nothing in the language of the "License to YouTube" or the "License to Other Users" conditions Richardson's grant of permission to embed the Melle Mel Video on Townsquare's compliance with YouTube's various policies. Accordingly, any limitations that appear elsewhere in the YouTube Terms or other agreements constitute covenants between YouTube and Townsquare, which Richardson may not enforce. While YouTube has the power to enforce those covenants, including by "suspend[ing] or terminat[ing]" Townsquare, App'x 117, any violations of the covenants by Townsquare have no bearing on

the scope of the licenses Richardson granted. The district court therefore correctly dismissed Richardson's claim based on the Melle Mel Video.[10]

## CONCLUSION

For the reasons above, we **VACATE** the district court's judgment as to Townsquare's use of the Jordan Video and the screenshots from the Jordan Video and the Melle Mel Video, **AFFIRM** the district court's judgment as to Townsquare's use of the Melle Mel Video, and **REMAND** for further proceedings consistent with this opinion.

---

[10] The license on its face does not appear to cover Townsquare's use of the screenshots, and indeed Townsquare does not suggest that it does. Thus our holding here applies only to Townsquare's embedding of the video.